No. 23-3265

# In the
# United States Court of Appeals
## for the Sixth Circuit

———————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

WILLIAM HITCHINGS, V,

*Defendant-Appellant.*

———————

On Appeal from the United States District Court
for the Southern District of Ohio
No. 3:21-cr-061 (Rose, J.)

———————

**BRIEF FOR PLAINTIFF-APPELLEE UNITED STATES**

———————

For the Appellee:

KENNETH L. PARKER
United States Attorney

CHRISTINA E. MAHY
Assistant United States Attorney
200 West Second Street, Suite 600
Dayton, Ohio 45402
(937) 225-2910

# TABLE OF CONTENTS

Table of Authorities ..................................................................................iii

Statement Regarding Oral Argument ....................................................... vi

Statement of Jurisdiction .......................................................................... 1

Issues Presented ........................................................................................ 2

Statement of the Case ............................................................................... 3

    A. Statement of Facts.......................................................................... 3

        1. A search warrant is executed and Hitchings is transported
           to the police station ................................................................. 3

        2. Hitchings is Mirandized, agrees to speak to law
           enforcement, and admits to possessing illegal child
           pornography ............................................................................ 4

        3. Hitchings makes equivocal statements regarding counsel,
           then has an emotional outburst and is handcuffed for his
           own safety ................................................................................ 6

        4. Hitchings reinitiates conversation, and law enforcement
           repeatedly reminds him of his rights .................................... 7

        5. Hitchings takes a Computer Voice Stress Analysis Test,
           disputes the results of the test, and the interview ends ....... 8

    B. Federal Proceedings .................................................................... 9

        1. Indictment and motion to suppress ...................................... 9

        2. The district court's ruling .................................................... 10

i

3. Guilty plea and sentence ......................................................... 12

Summary of the Argument ...................................................... 14

Argument ...................................................................................... 16

    The District Court Correctly Rejected Hitchings's Motion to
    Suppress.......................................................................................... 16

        A. The district court properly concluded that Hitchings's
        Miranda waiver was knowing, intelligent, and voluntary ... 16

        B. It was not necessary for law enforcement to re-issue the
        Miranda warnings.................................................................. 24

        C. The district court did not err in finding that, assuming
        Hitchings invoked his right to counsel, he immediately
        reinitiated conversation ......................................................... 29

        D. The district court did not err in finding that Hitchings's
        statements were voluntary ..................................................... 36

Conclusion.................................................................................... 40

Certificate of Compliance......................................................... 41

Designation of Relevant District Court Documents ............. 42

Certificate of Service ................................................................ 43

# TABLE OF AUTHORITIES

Cases:

*Bachynski v. Stewart*, 813 F.3d 241 (6th Cir. 2015) ............................... 30

*Bray v. Cason*, 375 F. App'x 466 (6th Cir. 2010). .................................... 36

*Bush v. Warden, S. Ohio Corr. Facility*,
    573 F. App'x 503 (6th Cir. 2014) ..................................................... 33

*Colorado v. Connelly*, 479 U.S. 157 (1986) ............................................ 37

*Colorado v. Spring,* 479 U.S. 564 (1987) ............................................... 18

*Davis v. United States,* 512 U.S. 452 (1994) ........................................... 32

*Dickerson v. United States*, 530 U.S. 428 (2000) .................................... 38

*Edwards v. Arizona,* 451 U.S. 477 (1981) ............................................... 30

*Garner v. Mitchell*, 557 F.3d 257 (6th Cir. 2009) ................................... 18

*McKinney v. Hoffner*, No. 2:13-CV-15284, 2015 WL 1219527
    (E.D. Mich. Mar. 17, 2015) *rev'd and remanded,* 830 F.3d 363
    (6th Cir. 2016) .................................................................................. 35

*Mitchell v. Gibson*, 262 F.3d 1036 (10th Cir. 2001) ............................... 27

*Oregon v. Bradshaw*, 462 U.S. 1039 (1983) ............................................ 36

*Smith v. Illinois*, 469 U.S. 91 (1984) ....................................................... 34

*Treesh v. Bagley*, 612 F.3d 424 (6th Cir. 2010) ................................. 26–27

*United States v. Amawi,* 695 F.3d 457 (6th Cir. 2012) ............................ 32

iii

*United States v. Bistline*, 665 F.3d 758 (6th Cir. 2012) ........................ 20

*United States v. Brown*, 443 F. App'x 956 (6th Cir. 2011) ..................... 39

*United States v. Chapman*, 112 F. App'x 469 (6th Cir. 2004) ............... 39

*United States v. Clay*, 320 F. App'x 384 (6th Cir. 2009) ........................ 33

*United States v. Demma*, 948 F.3d 722 (6th Cir. 2020) ......................... 20

*United States v. Dunn,* 269 F. App'x. 567 (6th Cir. 2008) ..................... 23

*United States v. Gill*, 685 F.3d 606 (6th Cir. 2012) ................................ 16

*United States v. Graham*, 483 F.3d 431 (6th Cir. 2007) ......................... 16

*United States v. Jackson*, 70 F.4th 1005 (7th Cir. 2023) ........................ 34

*United States v. Lawrence*, 735 F.3d 385 (6th Cir. 2013) ....................... 18

*United States v. McNeil*, 106 F. App'x 294 (6th Cir. 2004) .............. 25, 26

*United States v. Miller*, 562 F. App'x 272 (6th Cir. 2014) ..................... 23

*United States v. Montgomery*, 621 F.3d 568 (6th Cir. 2010) ................. 23

*United States v. Newman*, 889 F.2d 88 (6th Cir. 1989) .................... 38–39

*United States v. Ramamoorthy,* 949 F.3d 955 (6th Cir. 2020) ......... 16, 25

*United States v. Robinson*, 778 F.3d 515 (6th Cir. 2015) ....................... 20

*United States v. Scott*, 553 F. App'x 555 (6th Cir. 2014) ................. 33–34

*United States v. Treadwell*, 11 F. App'x 502 (6th Cir. 2001). ................ 39

*United States v. Ware*, 338 F.3d 476 (6th Cir. 2003) ............................. 30

iv

*United States v. Weekley*, 130 F.3d 747 (6th Cir. 1997) ........................... 26

*United States v. White*, 68 F. App'x 535 (6th Cir. 2003) ......................... 26

*Withrow v. Williams*, 507 U.S. 680 (1993) ............................................... 37

*Wood v. Ercole,* 644 F.3d 83 (2d Cir. 2011) ............................................. 35

*Wyrick v. Fields*, 459 U.S. 42 (1982) .................................................. 27, 28

<u>Statutes:</u>

18 U.S.C. § 3231 ........................................................................ 1

28 U.S.C. § 1291 ........................................................................ 1

## STATEMENT REGARDING ORAL ARGUMENT

The facts and legal arguments of the parties are adequately presented in the briefs and the record.  Oral argument is therefore unnecessary.

## STATEMENT OF JURISDICTION

Jurisdiction was proper in the district court under 18 U.S.C. § 3231 because Defendant-Appellant William Hitchings was charged with federal crimes, specifically receipt of child pornography and being a controlled substance user in possession of a firearm.  The district court announced its sentence on March 8, 2023, and entered judgment on March 9, 2023.  Mr. Hitchings filed his notice of appeal on March 10, 2023.  This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1. Whether the District Court erred in finding that Hitchings's waiver of his *Miranda* rights was knowing, intelligent, and voluntary. (*Corresponding to Appellant's second issue*)

2. Whether law enforcement was required to re-issue *Miranda* warnings an hour into the interview, after Mr. Hitchings was handcuffed for his own protection. (*Corresponding to Appellant's first issue*)

3. Whether the District Court erred in finding that Hitchings immediately reinitiated conversation after invoking his right to counsel. (*Corresponding to Appellant's third issue*)

4. Whether the District Court erred in finding that Hitchings's statements were voluntary. (*Corresponding to Appellant's fourth issue*)

# STATEMENT OF THE CASE

*A. Statement of Facts*

    1. <u>A search warrant is executed and Hitchings is transported to the police station.</u>

    In February 2021, law enforcement executed a search warrant for William Sidney Hitchings V, his vehicle, and his Troy, Ohio residence. (R. 37, Order Denying Suppression at 265.)[1]  Hitchings was handcuffed and transported to the Troy Police Department by Officer Jeffrey Kunkleman and Special Agent Andrea Kinzig of the Federal Bureau of Investigation.  (*Id*. at 266.)  At the station, Hitchings was escorted to an interview room and his handcuffs were removed.  (*Id*.)  The door to the interview room was not locked, and Kunkleman and Kinzig were dressed in plain clothes.  (R. 33, Transcript at 147-48.)

---

[1] Citations to those parts of the record that have been electronically filed include the record entry number, a brief description, and the pageid number.

3

2. <u>Hitchings is Mirandized, agrees to speak to law enforcement,
and admits to possessing illegal child pornography</u>.

Kunkleman and Kinzig began interviewing Hitchings at approximately 6:32 am. (R. 37, Order Denying Suppression at 266.) Kinzig explained that they had a search warrant for Hitchings's house, but that he was not under arrest and was free to leave at any time. (*Id.* at 270 (citing Government Exhibit 1[2], Recording of Hitchings Interview at 6:35:50; 6:39:38-6:39:43; 6:40:55-6:41-10)).

After obtaining some preliminary information from Hitchings—his level of education, that he could read and write English—Kinzig read Hitchings his *Miranda* rights. (*Id.* at 266.) Hitchings confirmed that he understood his rights, and signed an Advice of Rights form confirming that he understood his rights and was willing to speak to law enforcement without counsel. (*Id.*; R. 72, notice of exhibit filing at 698, Govt. Suppression Exh. 2, Advice of Rights Form.)

---

[2] An electronic copy of this video exhibit has been filed by hand with this Court. Consistent with the district court's opinion, timestamps provided in this Brief correspond to the timestamps appearing in the top lefthand corner of the video, which show the date and time (ex. 7:30:00 am.), rather than the time at the bottom of the screen which indicates how far into the video the viewer is (ex. 1:0:00 hours into the video).

Hitchings refused to answer several specific questions posed by the officers.  (R. 37, Order Denying Suppression at 266 (citing Government Exhibit 1, Recording of Hitchings Interview at 6:55:58- 6:56:00; 6:58:52; 7:08:42-7:08:46; 7:15:30-7:15:38; 7:15:38-7:16:16).)

At approximately 7:21am, Hitchings admitted to possessing illegal child pornography.  Kinzig asked Hitchings what he thought the interview was about and the following exchange occurred:

HITCHINGS: "certain content, certain data. Is that what it's about?"

AGENT KINZIG: "It is"

HITCHINGS: "Okay then yes, it's me."

AGENT KINZIG: "Now, what data are we talking about?"

HITCHINGS: "Illegal content."

AGENT KINZIG: "And what kind?"

HITCHINGS: "Underage and probably bestiality."

AGENT KINZIG: "Are we talking about pornography?"

HITCHINGS: "Uh-huh. And that's the only thing that I have, that's it."

(*Id*. at 7:21:22 – 7:21:53.)

Kinzig then asked Hitchings what devices the underage pornography was on, so they would not have to seize all the electronic devices in the home. (*Id.* at 7:21:55.) Hitchings began to answer the question, and then slammed his head onto the table. (*Id.*)

3. <u>Hitchings makes equivocal statements regarding counsel, then has an emotional outburst and is handcuffed for his own safety.</u>

Kinzig immediately told Hitchings not to harm himself. (*Id.* at 7:22:05). She then asked him what servers the child pornography was on, and Hitchings stated "Lawyer. I have to have a lawyer from this point on. Don't I?" to which Kinzig replied, "It's up to you." (Government's Exhibit 1, Recording of Hitchings Interview at 7:22:21-7:22:25.) This conversation continued, with Hitchings asking if he should get an attorney, and the officers advising that it was his decision. (*Id.* at 7:22:25-7:23:00.)

During this exchange, Hitchings became emotional and complained that, because he liked to look at pornography, he was going to lose everything. (*Id.* at 7:23:20). Hitchings then began punching himself in the head. (*Id.* at 7:23:40-7:24:45.) Hitchings was handcuffed by Kinzig and Kunkleman for his own safety. (*Id.* at 7:23:55.)

Kinzig gathered up her possessions and began to leave the room. (Government Exhibit 1, Recording of Hitchings Interview at 7:26:10.) Kinzig testified she was planning to end the interview based on Hitchings's comments, which she found unclear but was treating as an invocation of counsel out of an abundance of caution. (R. 33, Transcript at 159.)

4. Hitchings reinitiates conversation, and law enforcement repeatedly reminds him of his rights.

Kinzig was stopped from leaving the room by Hitchings, who stated: "wait, wait, wait, wait." (Government's Exhibit 1, Recording of Hitchings Interview at 7:26:42.) Kinzig repeatedly reminded Hitchings of his right to counsel and asked if he was willing to speak to them.  (*Id*. at 7:27:43 – 7:28:00; 7:28:09-7:28:30; 7:28:49-7:29:25.)   Hitchings confirmed several times that he was willing to speak to them without counsel and that he wanted to assist them.  (*Id*.)

Kinzig and Kunkleman continued to interview Hitchings.  After his initial emotional outburst, Hitchings did not have any further outbursts, and the interview returned to its previous conversational tone, with Hitchings making additional admissions.  (*Id*. at 7:30:00-11:22:00.)

5. <u>Hitchings takes a Computer Voice Stress Analysis Test, disputes the results of the test, and the interview ends.</u>

Towards the end of the interview, Hitchings agreed to take a Computer Voice Stress Analysis test. (*Id.* at 11:22:00 – 11:22:10.) After the test was completed, Hitchings insisted that he had not lied on the test, and repeatedly denied having any sexual contact with a minor or producing child pornography. (*Id.* at 12:02:00-12:05:00.)

Around 12:20 pm the following exchange occurred:

Hitchings: "I didn't touch anyone, I won't touch anyone, I'm not going to touch anyone, what I say and what I jerk off to shouldn't be anyone's business but my own. Do I need an attorney or are we still doing okay?

Kunkleman: "The attorney thing is up to you."

Hitchings: "I want to be as helpful as possible, I don't want to sit here and tell you the truth and have it incriminate me, like, that's what I'm worried about, because they have machines that can discount the things that I say, they can discredit just the way that I say it."

(*Id.* at 12:19:56 -12:20:30.)

After this exchange, no further questions about the investigation were asked of Hitchings, and Kunkleman left the room shortly thereafter. (*Id.* at 12:21:00 - 12:22:20.) Hitchings was then transported to the marshal's office pursuant to a probable cause arrest. (*Id.* at 12:26:27.)

*B. Federal Proceedings*

    1.  <u>Indictment and motion to suppress</u>

A federal grand jury indicted Hitchings in a Superseding Indictment with possession of child pornography ("Count One"), being a user of controlled substances in possession of a firearm ("Count Two"), two counts of receiving child pornography ("Counts Three and Four"), and transportation of child pornography ("Count Five").  (R. 27, Superseding Indictment at 120-22.)

Hitchings filed a motion to suppress, arguing that the interview was custodial, that his *Miranda* waiver was not knowing, intelligent, and voluntary, that he had invoked his right to counsel approximately fifty minutes into the interview, and that his statements were not voluntary. (R. 31, Motion to Suppress at 133-35.)  Following an evidentiary hearing, Hitchings filed supplemental briefing reiterating these arguments.  (R. 34, Supplemental Memorandum at 189-234.)

The Government responded, arguing that the interview was not custodial, that Hitchings's *Miranda* waiver was knowing, intelligent, and voluntary, that Hitchings did not unambiguously invoke his right to counsel, that in any event Hitchings had reinitiated conversation with

9

law enforcement immediately after his mention of counsel, and that his statements were voluntary. (R. 35, Government's Response in Opposition at 238-54.) Hitchings filed a reply reiterating his earlier arguments. (R. 36, Defendant's Reply Memorandum at 256-264.)

2. <u>The district court's ruling</u>

The district court found that Hitchings's interview was custodial. (R. 37, Order Denying Motion to Suppress at 270-71.) The court reasoned that, although Kinzig did advise Hitchings "multiple times" that he was free to leave and was not under arrest, those statements were in the "initial stages" of the six-hour interview. (*Id.* at 270.) Such statements were not "a way for the police to declare an entire interrogation non-custodial." (*Id.* at 271.) The court emphasized Hitchings's restraint in handcuffs following his emotional outburst and reasoned that it was "a stretch to imagine that a reasonable person would believe that they could subsequently ask to have the handcuffs removed and, in the same breath, ask to leave an interview room entirely." (*Id.* at 271.) The court thus concluded that "Hitchings was subject to a custodial interrogation." (*Id.*) The court's conclusion did not distinguish between the beginning and later parts of the interview. (*Id.*)

10

The district court next found that Hitchings's *Miranda* waiver was knowing, intelligent, and voluntary. (*Id*. at 272.) The court noted that Hitchings's first language is English, he can read and write, he had a high school diploma with some subsequent vocational training, and that he confirmed that he understood his rights. (*Id*. at 273.) Furthermore, the Court found that Hitchings signed a form confirming that he understood his rights and that he was willing to answer questions without a lawyer present. (*Id*.) Finally, the Court found that Hitchings understood his right to remain silent as evidenced by his refusal to answer certain questions. (*Id*.)

The district court found that Hitchings unequivocally invoked his right to counsel at 7:22am when he stated "I'm not answering your questions anymore give me a [explicative] attorney. Please give me an attorney". (*Id*. at 275, quoting R. 34, Defendant's Supplemental Memorandum at 199.) However, the district court found that Hitchings immediately reinitiated conversation with law enforcement by following his invocation with a question, "That's what I'm supposed to do, right?" and by inviting the officers' opinions, "Tell me honestly, like what do you think I . . ." (*Id*., quoting Government Exhibit 1, Recording of Hitchings

Interview at 7:22:20 – 7:22:58.)  The court also relied on Kinzig asking Hitchings multiple times whether he wanted an attorney and Hitchings's multiple assertions that he was willing to continue.  (*Id*. at 277.)

Finally, the district court found that Hitchings's statements were voluntary.  (*Id*. at 277-79.)  The court acknowledged that the interview lasted six hours in a windowless room at the police department, that Hitchings was in emotional distress during the interview and had used methamphetamine and marijuana prior to the interview.  (*Id*. at 279.) But without "coercive police activity," these circumstances could not render his statements involuntary. (*Id*. at 279-80.) Moreover, Hitchings appeared alert and lucid during the interview; was given breaks; was well-educated; and had received *Miranda* warnings.  (*Id*. at 278-80.)

### 3. Guilty plea and sentence

Hitchings entered a plea of guilty to Count Three of the Superseding Indictment, receipt of child pornography in violation of 18 U.S.C. § 2252(a)(2) and (b)(1).  (R. 45, Plea Agreement at 293.)  The plea agreement preserved Hitchings's right to appeal the district court's denial of his motion to suppress.  (*Id*. at 299.)  Hitchings was sentenced

to 120 months incarceration.  (R. 62, Judgment Entry at 569.)  This

timely appeal followed.

## SUMMARY OF THE ARGUMENT

The district court's order denying Hitchings's motion to suppress should be affirmed.

First, the district court did not err in finding that Hitchings's waiver of his *Miranda* rights was knowing, intelligent, and voluntary. The totality of the circumstances demonstrates that Hitchings was aware of his rights and freely chose to waive them.

Second, it was not necessary for law enforcement to re-issue the *Miranda* warnings to Hitchings when they placed him in handcuffs for his own protection. This occurred only an hour after Hitchings's *Miranda* waiver at the beginning of the interview, and did not constitute the sort of change in circumstances that necessitates repeating *Miranda* warnings. Both agents also reminded Hitchings several times of his right to counsel, and Hitchings stated he understood his right and was still willing to speak.

Third, the district court did not err in finding that Hitchings reinitiated conversation after tentatively invoking his right to counsel. Immediately after mentioning a desire for counsel, Hitchings (unprompted) asked the officers further questions.

14

Fourth, the district court did not err in finding that Hitchings's statements were voluntary.  There was no police coercion, and the totality of the circumstances demonstrates that Hitchings's will was not overborne when he made his statements.

# ARGUMENT

## *The District Court Correctly Rejected Hitchings's Motion to Suppress.*

When considering the denial of a motion to suppress, this Court "review[s] a district court's factual findings for clear error and [its] legal conclusions *de novo*." *United States v. Graham*, 483 F.3d 431, 435 (6th Cir. 2007). In doing so, this Court considers "the evidence in the light most favorable to the district court's conclusion." *Id.* Suppression arguments presented for the first time on appeal are reviewed only for plain error. *See United States v. Ramamoorthy,* 949 F.3d 955, 962 (6th Cir. 2020). This Court may affirm a suppression ruling on any ground supported by the record. *See United States v. Gill*, 685 F.3d 606, 609 (6th Cir. 2012).

### A. *The district court properly concluded that Hitchings's Miranda waiver was knowing, intelligent, and voluntary.*

Although the district court did not draw any distinction between various portions of the interview, both parties agree on appeal that the initial portion of Hitchings's interview (prior to his emotional outburst and handcuffing) was not custodial. (*See* Appellant's Br. at 8, 10-11; *id.*

16

at 12 (agreeing that "the Defendant was completely free to leave" and "the interview situation was non-custodial" until "around 7:30, circumstances changed"). As such, even by Appellant's account, any statements made prior to this time, including Hitchings's initial admission to possessing "underage" "illegal" pornography (Government's Exhibit 1, Recording of Hitchings Interview at 7:21:22 – 7:21:55), were non-custodial statements that do not implicate *Miranda*.[3]

*Miranda* warnings were nevertheless given at the outset of the interview in an abundance of caution. Hitchings reviewed and signed an Advice of Rights form, acknowledging his rights and his consent to speak with officers. Hitchings asserts, however, that his *Miranda* waiver was not knowing and intelligent due to his mental state during the interview: because he was emotional, and because he was confused about the legal peril he was in, as evidenced by his belief that possession of child

---

[3] Notably, none of Hitchings's arguments on appeal, even if successful, would require suppression of these initial admissions prior to his emotional outburst and handcuffing. (*See* Appellant's Br. at 12 (acknowledging initial portion of interview was not custodial); *id.* at 34-35 (basing voluntariness argument on atmosphere following Hitchings's emotional outburst).

pornography is a victimless crime. (Appellant's Br. at 17-22.)  Hitchings is wrong on both counts.

In considering whether a [*Miranda*] waiver is knowing and intelligent, "[t]he relevant question is not whether the 'criminal suspect [knew] and [understood] every possible consequence of a waiver of the Fifth Amendment privilege,' but rather whether the 'suspect [knew] that he [could] choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time.'"  *Garner v. Mitchell*, 557 F.3d 257, 261–63 (6th Cir. 2009)(quoting *Colorado v. Spring,* 479 U.S. 564, 574 (1987).

A defendant being distressed or upset during an interview is not unusual, and does not render a *Miranda* waiver invalid. *See, e.g., United States v. Lawrence*, 735 F.3d 385, 438 (6th Cir. 2013) (affirming district court's holding that the defendant's *Miranda* waiver was knowing and voluntary despite the defendant being shot three days prior, wincing in pain during the interview, and asking to be taken to the hospital). The key point is whether Hitchings understood his *Miranda* rights — and all the evidence indicates that he did.  *See Garner*, 557 F.3d at 261–63.

18

Throughout the interview, Hitchings challenged or refused to answer certain questions. When Kinzig asked Hitchings who owned the company he worked for, Hitchings responded that it was not relevant. (Government Exhibit 1, Recording of Hitchings Interview at 6:55:57.) Kinzig respected Hitchings's refusal to answer and moved on.  (*Id*.) Similarly, when Kinzig asked Hitchings when he last used methamphetamine, Hitchings asked why she wanted to know before answering.  (*Id*. at 6:58:50.)  When Kinzig asked Hitchings where the methamphetamine was located, Hitchings demanded to know why they were really there.  (*Id*. at 6:59:11.)  Hitchings reiterated that he was "happy to" answer their questions, but that he wanted the agents to get to why they are really there.  (*Id*. at 6:59:35)  Hitchings also refused to answer a question about how he logged onto his Facebook, and to disclose the passwords to his servers.  (*Id*. at 7:08:45; 7:15:30.)

Kinzig's tone remained polite and non-confrontational throughout the interview.  Hitchings was plainly not in any fear of the officers; he did not feel compelled to answer all of their questions or behave politely to them.  The only time the officers were stern with Hitchings was when he attempted to harm himself.

19

Similarly, the evidence belies Hitchings's claim that he was confused about the legal peril he was in. Although Hitchings attempted to *morally* justify his own crimes[4] — attempting to distinguish his own actions from those of child pornography producers — he still clearly understood that his possession and distribution was *illegal*. Hitchings spoke at some length about his belief that, while possession was illegal, it was not morally wrong in the way that production was. Hitchings stated he believed possession of child pornography had been criminalized by society for reasons of "religion" and "control". (Government Exhibit 1, Recording of Hitchings Interview at 8:20:25.) Of possession of child

---

[4] Hitchings's view that possession of child pornography is a victimless crime and that he was being persecuted – while incorrect – is hardly a unique view. Plenty of child pornography offenders justify their actions in this way. Indeed, it is an oft relied on defense in possession cases to contrast the offense to production, and in doing so to minimize the grievous harm caused by possession of child pornography. There is a reason this Court in *United States v. Bistline*, 665 F.3d 758 (6th Cir. 2012) had to reiterate so strongly that possession of child pornography is neither a passive act nor a victimless crime. *Id.* at 765. See also *United States v. Robinson*, 778 F.3d 515, 519–20 (6th Cir. 2015); *United States v. Demma*, 948 F.3d 722, 730 (6th Cir. 2020). Hitchings's reaction — casting himself as the victim and bemoaning the unfairness of having to face the consequences of his actions — rather than being a "marked abnormality" (Appellant's Br. at 18), is unfortunately a fairly common reaction of a defendant in his position.

20

pornography being criminalized, Hitchings said: "I understand it, I know it's illegal. I don't like breaking the law." (*Id*. at 8:20:50.) Hitchings explained his theory that sexual interest in children was biological or innate in certain people. (*Id*. at 8:21:00.) "I think there's a reason for it. People just are that way for a reason. It's heredity or biological…. So, I'm not going to sit here and say that I believe that what I view and my response to it is wrong, I understand entirely that possessing is illegal, and in that respect is wrong, yes, absolutely." (*Id*. at 8:21:00-8:21:30.) Hitchings therefore clearly indicated that, though he had found a way to justify his actions to himself, he still understood that they were illegal and he was in trouble.

Hitchings's demeanor throughout the interview also demonstrated that he understood where he was, who he was speaking to, and what they were discussing. Hitchings never appeared disoriented as to time, place, or subject. Additionally, Hitchings's behavior demonstrated his intelligence and technical experience. He was able to answer Kinzig's questions about the two technology companies he ran out of his home, as well as specific questions about different types of technology. (*Id*. at 6:53:30 – 6:57:30).

While Hitchings was upset at being caught, and reacted emotionally, his behavior was not illogical. Hitchings tried to explain his conduct in an effort to impress upon the officers that his actions were really not all that bad. Hitchings's efforts make it clear he understood he was in legal trouble. He responded by trying to engage the officers' sympathies — insisting he would never engage in a contact offense, contrasting his conduct to that of producers, and declaring that his life was over and that he wanted to kill himself. Rather than demonstrating that Hitchings was confused about what was happening, Hitchings's behavior makes it clear he was aware he was in legal trouble and was trying to influence the officers into being more sympathetic towards him.

Hitchings also demonstrated insight into the interview as a whole; he became frustrated that Kinzig asked him background questions at the beginning of the interview, and repeatedly admonished her to get to the point. Hitchings was able to tell that her initial questions were not the crux of the issue being investigated. When Kinzig asked Hitchings about his surveillance camera footage, he lost patience, and said that he would not tell her where the camera footage was until she told him the real reason for the investigation. (*Id*. at 7:19:35-7:19:40.)

22

While Hitchings indicated that he had taken methamphetamine and marijuana prior to the interview, drug use alone does not mean that a *Miranda* waiver is not knowingly and intelligently made. In *United States v. Dunn,* 269 F. App'x. 567, 572 (6th Cir. 2008), for example, this Court upheld a *Miranda* waiver despite the defendant's use of Vicodin and marijuana. *Id.* at 572. This Court relied on the credible testimony of the officer that the defendant "was alert and quick to respond to questions, and appeared to understand his *Miranda* rights," as well as the lower court's finding that an audiotape recording of the interview "revealed that [the defendant] was alert, coherent, and lucid" when his rights were read to him. *Id.* at 573. *See also United States v. Miller*, 562 F. App'x 272, 290 (6th Cir. 2014); *United States v. Montgomery*, 621 F.3d 568, 573–74 (6th Cir. 2010).

Kinzig testified that Hitchings was able to communicate intelligently throughout their interaction, and that he did not seem confused about what was happening. (R. 33, Transcript at 154-55.) She also testified that, although Hitchings stated he consumed marijuana and methamphetamine recently, he did not appear to be under the influence or impaired. (*Id.*) Hitchings told her that he had been using

23

marijuana and methamphetamine daily for many years. (*Id.* at 153-54; Government Exhibit 1, Recording of Hitchings Interview at 10:41:31-10:42:00.)    Additionally, when specifically questioned on whether his drug use was affecting his ability to understand questioning and communicate during the interview, Hitchings stated that he was "fully competent" and "fully aware." (*Id.* at 6:42:30- 6:43:25.)

Under the totality of the circumstances, the evidence demonstrated that Hitchings understood he was not required to answer the officers' questions, and that his *Miranda* waiver was knowing, intelligent, and voluntary.

### B. *It was not necessary for law enforcement to re-issue the Miranda warnings.*

As noted above, *see supra* at 16-17, the parties agree that the first portion of the interview, up through Hitchings's initial admissions, was not custodial. Hitchings argues that the interview became custodial "around 7:30" when, following those initial statements, he became agitated and was handcuffed, and that it was necessary for officers to repeat the *Miranda* warnings at that point. (Appellant's Br. at 12.)

Hitchings did not make this argument below, and as such, review of the issue is only for plain error. *See Ramamoorthy,* 949 F.3d at 962.[5]

In any event, the argument fails under any standard of review. Even assuming that the remainder of the interview was custodial, Hitchings is incorrect that this meant law enforcement was required to re-*Mirandize* Hitchings, merely an hour after he had been advised of his *Miranda* rights at the beginning of the interview.

Determining whether additional *Miranda* warnings are required is based on the totality of the circumstances, *United States v. McNeil*, 106 F. App'x 294, 301 (6th Cir. 2004), including how much time elapsed

---

[5] Hitchings claims this argument was preserved based on a passing statement by the district court describing him as arguing that the officers failed to honor his request for counsel and instead resumed their interrogation "without reiterating Hitchings's *Miranda* rights." (*See* Appellant's Br. at 9, n.1, citing R. 37, Order Denying Suppression at 275.) But this portion of the district court's opinion, and the defendant's filing that it cited (*see* R. 34, Defendant's Supplemental Memorandum at 199), were addressing his distinct argument that the officers impermissibly continued the interview after he arguably invoked his right to counsel (a point he addresses in Part IV of his Argument on appeal, and which is addressed in the next subsection of this brief). He did not make, and the district court did not address, the different argument that he makes in Part II of his Argument on appeal: that a repetition of the *Miranda* warnings was required because "circumstances escalated into custodial interrogation when Defendant was handcuffed after an emotional breakdown," (Appellant's Br. at 9.)

between the reading of rights and the interrogation, whether the interviewer changed, whether the defendant was alert and clearly understood his rights, whether the defendant had invoked any of his rights, whether anything affecting the defendant's understanding of his rights occurred between the *Miranda* warnings and the interrogation, whether the defendant was reminded of his rights, and whether any police coercion or promises of leniency happened in the interim. *United States v. Weekley*, 130 F.3d 747, 751 (6th Cir. 1997).

In this case the officers were not required to re-*Mirandize* Hitchings around 7:30 am. Only an hour had elapsed since the interview began at 6:32 am. (R. 37, Order Denying Suppression at 266.) The same officers, Kunkleman and Kinzig continued to question Hitchings in the same room. In *McNeil*, 106 F. App'x 294, this Court held that a second set of *Miranda* warnings was not necessary for an interview by the same officer even "the next day" (where less than 24 hours had elapsed). *Id.* at 301. *See also United States v. White*, 68 F. App'x 535, 538 (6th Cir. 2003)(finding second *Miranda* warnings were not required after three days where the same officer interviewed the defendant, and reminded the defendant of his rights); *Treesh v. Bagley*, 612 F.3d 424, 432 (6th Cir.

2010) (concluding state court did not unreasonably apply federal law when it concluded police officers were not required to re-administer *Miranda* rights after two hours had elapsed, even where the defendant was moved to a different jurisdiction); *Mitchell v. Gibson*, 262 F.3d 1036, 1057-58 (10th Cir. 2001) (rejecting argument that pre-custodial *Miranda* warnings needed to be repeated once defendant was not free to leave).

The critical analysis is whether a defendant remained aware of his *Miranda* rights.  In *Wyrick v. Fields*, 459 U.S. 42 (1982), the Supreme Court held that after a valid waiver a second set of *Miranda* warnings were not necessary, "unless the circumstances changed so seriously that [the defendant's] answers no longer were voluntary, or unless he no longer was making a 'knowing and intelligent relinquishment or abandonment' of his rights."  *Id*. at 47.  In finding that a second set of *Miranda* warnings were not required after a polygraph test was administered, the Court relied on the fact that the defendant "had been informed that he could stop the questioning at any time, and could request at any time that his lawyer join him" and that the change in circumstances — the completion of the polygraph — "could not remove this knowledge from [the defendant's] mind."  *Id*. at 47-48.

27

In the instant case, it is clear that the knowledge of his *Miranda* rights had not been removed from Hitchings's mind. Not only had a mere hour passed since the *Miranda* warnings were issued, but both Kinzig and Kunkleman reminded Hitchings of his rights numerous times. After Hitchings's emotional outburst and statement about a lawyer, Kinzig and Kunkleman repeatedly reminded Hitchings of his right to counsel and asked him if he was comfortable speaking to them without counsel. (Government's Exhibit 1, Recording of Hitchings Interview at 7:27:43 – 7:28:00; 7:28:09-7:28:30; 7:28:49-7:29:25.)    Hitchings stated numerous times that he was. (*Id.*)

There is also no indication that Hitchings being handcuffed was a circumstance so extreme as to render his answers involuntary. *Fields*, 459 U.S. 47. Hitchings had been previously handcuffed during transport, he was only re-handcuffed to prevent him from harming himself, and once Hitchings had calmed down Kinzig and Kunkleman offered to remove the handcuffs several times.[6]    (Government's Exhibit 1,

---

[6] The officers offered to remove the handcuffs only approximately twelve minutes after they had been put back on Hitchings. (Government's Exhibit 1, Recording of Hitchings Interview at 7:35:25- 7:35:40.) Hitchings declined having the handcuffs removed stating that he was

28

Recording of Hitchings Interview at 7:35:25- 7:35:40; 9:09:50-9:10:10; 10:40:30-10:44:35.)  Once Hitchings had calmed down, the tenor of the interview also returned to its earlier, conversational atmosphere.

Under the totality of the circumstances, Hitchings understood his *Miranda* rights and remained aware of his rights throughout the interview.  The officers were not required to readminister the *Miranda* warnings only an hour into the interview, after Hitchings was handcuffed for his own safety.

> ### C. The district court did not err in finding that, assuming Hitchings invoked his right to counsel, he immediately reinitiated conversation.

Hitchings next argues that the district court erred in finding that he reinitiated conversation with law enforcement after tentatively invoking his right to counsel.  Hitchings is incorrect.

When a suspect unequivocally invokes his right to counsel, he is not subject to further interrogation until counsel is made available, unless

---

comfortable.  (*Id*.)  Later in the interview, officer offered to remove then handcuffs again, which Hitchings declined, instead asking that they merely be loosened, which Kunkleman did.  (*Id*. at 9:09:50-9:10:10.) Finally, the officers offered to remove the handcuffs a third time, and Hitchings accepted.  (*Id*. at 10:40:30- 10:44:35.)

"the accused himself initiates further communication, exchanges, or conversations with the police." *See Edwards v. Arizona,* 451 U.S. 477, 484-85 (1981). In *United States v. Ware*, 338 F.3d 476 (6th Cir. 2003), for example, after the defendant invoked his right to counsel, one officer tried to contact the defendant's named attorney, while the other officer remained talking with the defendant on topics not relating to the investigation. *Id*. at 479. When the first officer returned, he advised that he couldn't reach the attorney but had left him a message, and asked the defendant "Any other suggestions or guesses?" *Id*. The defendant responded, "I'll just talk, that's all, you know, just forget it." *Id*. This Court found the defendant had "sufficiently initiated discussion of the crime after invoking his right to counsel." *Id*. at 481. *See also Bachynski v. Stewart*, 813 F.3d 241, 244 (6th Cir. 2015).

Here, after initially indicating a desire for counsel, Hitchings immediately, and of his own volition, changed his mind and reinitiated conversation with law enforcement.

Hitchings: Lawyer. I have to have a lawyer from this point on. *Don't I?*

Kinzig: It's up to you.

Hitchings: I want to help you, but it doesn't matter. I'm already dead anyway, so it doesn't fucking matter. I'm not answering questions anymore until you find me an attorney. Please find me an attorney.

Kinzig: Okay.

Hitchings: *That's what I'm supposed to do, right?*

Kinzig: It's your choice.

Kunkleman: It's up to you, William.

Hitchings: *Tell me honestly, like what do you think I. . .*

Kunkleman: Look I'm going to tell you honestly, okay. You want my opinion?

Hitchings: *I do.*

Kunkleman: I think it's always better to cooperate. I think it goes better in the court system. . . . .

(R. 37, Order Denying Motion to Suppress at 275-76; citing Government's Exhibit 1, Video of Hitchings Interview at 7:22:20-7:22:58)(emphasis added.)

Even despite Hitchings's resumption of the conversation in the sequence above, the officers remained cautious. Hitchings told Kinzig (who was standing in the doorway with her belongings, preparing to leave the interview room) to "wait, wait, wait, wait," and "sit down" and that

31

he "would tell you whatever you want to know." (Government's Exhibit 1, Recording of Hitchings Interview at 7:26:42, 7:27:40.) Kunkleman and Kinzig both reiterated to Hitchings that it was his decision if he wanted a lawyer or not, and he responded to both that he was willing to talk. (*Id.* at 7:27:45-7:28:13.) Kinzig stated again that they could get Hitchings a lawyer and that a lawyer could be appointed for him. (*Id.* at 7:28:20.) Hitchings responded that he "didn't need a lawyer." (*Id.* at 7:28:22) Both officers questioned Hitchings again if he wanted a lawyer, and he confirmed that he did not. (*Id.* at 7:28:59-7:29:30)

The district court correctly rejected Hitchings's arguments that the continued questioning violated his right to counsel. As an initial matter, as the United States argued below (R. 35, Government's Response at 248-251), Hitchings's purported invocations were not unequivocal in the first place. *See Davis v. United States,* 512 U.S. 452, 458-59 (1994) (requiring suspect to "unambiguously request counsel"). Simply "mentioning the prospect of talking with an attorney" is "not sufficient." *United States v. Amawi,* 695 F.3d 457, 485 (6th Cir. 2012). Given that they were immediately called into question by further statements and queries, Hitchings's statements regarding counsel were equivocal.

Alternatively, even if Hitchings is viewed as having unequivocally invoked his right to counsel during the above exchange, the district court correctly found that he "immediately re-initiated the conversation with investigators." (R. 37, Order Denying Suppression at 275.) His mentions of counsel are all immediately followed by questions to law enforcement: "I have to have a lawyer from this point on" followed by "Don't I?"; "Please find me an attorney" followed by, "[t]hat's what I'm supposed to do, right?"

The district court correctly analogized this case to *Bush v. Warden, S. Ohio Corr. Facility*, 573 F. App'x 503 (6th Cir. 2014), where Bush followed his invocation by reinitiating with officers, asking them "would it look better for me if I just go ahead and just tell you all? I mean, would it be better for me?" *Id*. at 505. While Hitchings seeks to distinguish *Bush* as a state habeas case, its analysis of the reinitiation issue supports the same outcome here, and other decisions lead to the same conclusion. *See, e.g., United States v. Clay*, 320 F. App'x 384, 388–89 (6th Cir. 2009) (holding the defendant had reinitiated discussions with investigators by asking officer "do you think I can talk to them again?"); *United States v. Scott*, 553 F. App'x 555, 557-58 (6th Cir. 2014) (holding defendant's post-

33

invocation statements "I know I *need* to talk to y'all, ... let me get my head together, ... I *will* talk to y'all later" went "well beyond what's needed to initiate contact"); *United States v. Jackson*, 70 F.4th 1005, 1011 (7th Cir. 2023) (even if defendant's arguably ambiguous statement qualified as an invocation of right to counsel, defendant reinitiated immediately by asking "What is there more I can do to help myself?").

Hitchings analogizes the instant case to *Smith v. Illinois*, 469 U.S. 91 (1984). However, the two cases are significantly distinct. In *Smith*, the Court describes the following exchange:

> "Q. You have a right to consult with a lawyer and to have a lawyer present with you when you're being questioned. Do you understand that?
>
> "A. *Uh, yeah. I'd like to do that.*
>
> "Q. Okay."

*Id.* at 93. The Smith Court went on: "[i]nstead of terminating the questioning at this point, the interrogating officers proceeded to finish reading Smith his *Miranda* rights and then pressed him again to answer their questions." (*Id.*) In *Smith*, unlike here, there was a clear invocation of the right to counsel, followed immediately by additional questioning by the police.

34

Hitchings seems to argue that his statements reinitiating conversation with the officers may not be considered because they occurred after his invocation. (Appellant's Br. at 25, 32, citing *McKinney v. Hoffner*, No. 2:13-CV-15284, 2015 WL 1219527 (E.D. Mich. Mar. 17, 2015), *rev'd and remanded*, 830 F.3d 363 (6th Cir. 2016).)

However, the district court in *McKinney* did not suggest that any statements a defendant made after invocation were irrelevant, but rather that after a defendant has invoked his right to counsel, any further statements *in response to police questioning* cannot cast doubt on the initial invocation. "[E]vents occurring minutes after an unequivocal invocation of counsel are irrelevant: all interrogation must stop until counsel is provided *or conversation is reinitiated by the suspect*." *McKinney*, at *5, quoting *Wood v. Ercole*, 644 F.3d 83, 92, n. 8 (2d Cir. 2011) (emphasis added).

Hitchings's questions, "I have to have a lawyer from this point on. Don't I? . . . That's what I'm supposed to do, right? . . . Tell me honestly, like what do you think I. . ." can, and should, be considered. These questions evinced Hitchings's willingness for a discussion about the investigation and were reinitiations of the conversation with law

enforcement.   *Oregon v. Bradshaw*, 462 U.S. 1039, 1045–46 (1983)(defendant's question "Well, what is going to happen to me now?" "evinced a willingness and a desire for a generalized discussion about the investigation[.]")

The district court did not err in finding that Hitchings reinitiated his conversation with law enforcement and voluntarily waived his right to counsel.

### D. The district court did not err in finding that Hitchings's statements were voluntary.

Hitchings finally argues that his statements were involuntary, at least from the time of his "emotional breakdown" around 7:30 am. (Appellant's Br. at 34.)   Hitchings is incorrect.   His statements throughout his entire interview were voluntary.

"When determining whether police coercion rendered a defendant's statement involuntary, we inquire whether, considering the totality of the circumstances, law enforcement overbore the will of the accused." *Bray v. Cason*, 375 F. App'x 466, 469 (6th Cir. 2010).   Courts must evaluate the totality of the circumstances in determining voluntariness, including: (1) whether there was police coercion; (2) the length of the

interrogation; (3) the location of the interrogation; (4) the continuity of the interrogation; (5) the suspect's maturity; (6) the suspect's education; (7) the suspect's physical condition and mental health; and (8) whether the suspect was advised of his or her *Miranda* rights. *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993).

"[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). This necessary predicate is not present in the instant case, and Hitchings does not claim to the contrary. Neither officer ever brandished their firearm, or threatened Hitchings in any way. (See generally, Government's Exhibit 1, Recording of Hitchings Interview; R. 33, Transcript at 169-70.) No one told Hitchings that he had to talk to law enforcement, or that anything bad would happen to him if he declined to talk to law enforcement. (R. 33, Transcript at 170.) No one engaged in any physical abuse of Hitchings. (*Id*. at 170-71.) No promises were made that Hitchings would receive any specific benefit if he spoke with law enforcement. (*Id*. at 171.) Hitchings was offered a snack, a drink, and the use of the restroom on several occasions. (*Id*. at 161.) There were

several breaks taken throughout the interview (*Id.* at 165), and when Hitchings stated that he needed to think, the officers gave Hitchings time to think and collect himself.  (See generally, Government's Exhibit 1, Recording of Hitchings Interview.) Absent any coercive police activity, Hitchings's voluntariness argument is foreclosed.

Even beyond the dispositive lack of any coercive police conduct, several of the other factors outlined in *Withrow* weigh in favor of voluntariness in any event. Hitchings graduated high school and had vocational training in computers. (Government's Exhibit 1, Recording of Hitchings Interview at 6:43:39.) He had been advised of his *Miranda* rights. *See Dickerson v. United States*, 530 U.S. 428, 444 (2000) ("cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of *Miranda* are rare"). He is of mature age and appeared throughout his interview to be intelligent an unintimidated by the officers.

Hitchings argues that he had consumed methamphetamine and marijuana, but that would not render his statements involuntary.  *See United States v. Newman,* 889 F.2d 88, 94 (6th Cir. 1989) ("Evidence that

38

a defendant suffered, at the relevant time, from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary."); *United States v. Chapman*, 112 F. App'x 469, 474 (6th Cir. 2004) ("Chapman does not argue that the police coerced him in any way, only that his heroin-befuddled state made him unduly frightened of them. But coercive police activity is a necessary predicate to the finding that a confession was not voluntary.") (internal citations omitted); *United States v. Brown*, 443 F. App'x 956, 959 (6th Cir. 2011); *United States v. Treadwell*, 11 F. App'x 502, 511 (6th Cir. 2001).

In any event, when questioned during the interview about how his drug use had affected him, Hitchings stated that he had no trouble understanding Agent Kinzig, and that he was "fully competent" and "fully aware." (Government's Exhibit 1, Recording of Hitchings Interview at 6:42:30-6:43:25.) And Agent Kinzig testified that, through her job, she is familiar with the demeanor of people who are under the influence of marijuana or narcotics, and that Hitchings did not appear to be impaired during the interview. (R. 33, Transcript at 153-54.) The District Court

credited Kinzig's testimony and found that Hitchings "was alert and quick to respond to questions." (R. 37, Order Denying Motion to Suppress at 279.)

The District Court did not err in finding that Hitchings's statements were voluntary.

## CONCLUSION

This Court should affirm the judgment of the district court.

Respectfully submitted,

KENNETH L. PARKER
United States Attorney

/s/ Christina E. Mahy
CHRISTINA E. MAHY
Assistant United States Attorney
200 West Second Street
Suite 600
Dayton, Ohio  45402
(937) 225-2910
Christina.mahy@usdoj.gov

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation provided in Rule 32(a)(7)(B)(i) of the Federal Rules of Appellate Procedure. The brief contains 7,146 words of Century Schoolbook (14 pt) proportional type. Word for Microsoft 365 is the word-processing software that I used to prepare this brief.

/s/ Christina E. Mahy
CHRISTINA E. MAHY

41

# DESIGNATION OF RELEVANT DISTRICT COURT RECORDS

The following are relevant under Sixth Circuit Rule 30(g) as to

Case No. 3:21-cr-61:

| Record number | Description | PAGE ID# |
|---|---|---|
| 27 | superseding indictment | 120-124 |
| 31 | motion | 130–136 |
| 33 | transcript | 138–188 |
| 34 | motion | 189–234 |
| 35 | response | 235–255 |
| 36 | reply | 256–264 |
| 37 | order | 265–280 |
| 45 | plea agreement | 293–305 |
| 62 | judgment | 568–576 |
| 65 | notice of appeal | 586–587 |
| 72 | notice of filing | 696–698 |

## CERTIFICATE OF SERVICE

I certify that this Brief for Plaintiff-Appellee United States was served on counsel for Defendant-Appellant William Hitchings by filing with the Court's CM/ECF system this 27th day of October, 2023.

/s/ Christina E. Mahy
CHRISTINA E. MAHY